Mr. Kliman. Thank you, Your Honor. May it please the Court, Robert Kliman of Gibson, Dun & Crutcher, on behalf of the appellant, Yucaipa. This panel raised a question as to whether or not this appeal was moot. Mr. Kliman, do you want to reserve any time for rebuttal? Maybe a minute, Your Honor. That request will be granted. Thank you. Yes, we did inquire about the mootness question, so if you want to proceed with that, that would be a good place to start. Thank you. And keep your voice up. That microphone, there you go. The short answer is no, the appeal is not moot. This Court has explained that the mootness doctrine is simply a shortcut for a court's decision that the fait accompli of a plan and confirmation should preclude further judicial proceedings. Equitable mootness is generally applied only to appeals challenging plan and confirmation orders. This is not an appeal to a plan and confirmation order. The plan in the underlying case has been confirmed but has not yet gone effective. And the plan itself has a carve out that provides that the plan, and when it goes effective, will have no effect on pending litigations between the parties. So it's our view that it's not moot. Black Diamond and Spectrum didn't raise it. It was their burden to do so below if it was. And so we believe that it's not moot, and even if it were, the issue has been waived. Okay. With jurisdictions of threshold issue, whether or not it was raised by the parties, and putting aside equitable mootness, the issue has been raised by the court as to any further relief that would follow from a declaration as to who is the requisite lender. In the district court, there was the concession that there was very little significance left to who was the requisite lender. And that's, there's been an intervening year. The plan was confirmed. What role is left for, what effect would our declaration as to the effectiveness of the Third Amendment or the original amendment have? Well, the, whether or not the Third Amendment is valid has significant impact on a variety of litigations that are still pending. UKIPA had cross motions that were struck based on a covenant not to sue in the Third Amendment. The requisite lender is still administering, has designated certain things to occur under the plan. They have, as their agent, they're holding back monies that we believe belong to us for attorney's fees and otherwise. So we believe there's still plenty left to do. Thank you. You represent UKIPA. I do. And there's also some potential claims against UKIPA, are there not? You might say that there's no validity to them, but there is some potential claims. That is correct, So if I may, I'll move to the meat of the, of the argument. The Third Amendment is void and of no effect under the terms of the First Lien Credit Agreement. This appeal rests on a strict interpretation of the First Lien Credit Agreement, which governs the debt at issue here. So we should look at specific sections of the First Lien Credit Agreement, which provide the framework for this appeal. If you have the First Lien Credit Agreement handy, it would start at JA2301. It might be helpful as I walk through some of the specific relevant sections. At JA2346, requisite lender is defined. It is a fraction, the denominator of which is comprised of all the outstanding term loan exposure, revolving exposure, and LC exposure of all lenders, and the numerator is a specific lender or lender's amount of holdings. If the fraction results in a number greater than 50%, the numerator can claim requisite lender status. Note that there is no requirement under the First Lien Credit Agreement that there is actually a requisite lender. If a majority of holders cannot find a common path, then there is no requisite lender. The requisite lender has certain powers, including to approve amendments to the First Lien Credit Agreement. That's set forth at Section 10.5A at JA2466. But the power of the requisite lender to consent to amendments is expressly subject to Section 10.5B, which is at JA2466-67, which sets forth the 11 provisions when unanimous lender consent, and not just requisite lender consent, must be obtained for an amendment to be valid. Without that consent, amendments are void. Let me ask you, let's assume you're right that the third amendment is void. Where does that leave us then? Do we send it back to the district court to determine what the rights of the respective parties are under the first and second amendment? Because I don't think anybody challenges the first and second, right? That's correct, Your Honor. Or do you want us to decide who's the requisite lender under the second amendment? What do we do? If you're right, what do we do? We are not asking you to determine that we are requisite lender. We're only asking you to determine that Black Diamond Spectrum is not requisite lender. Well, should we even do that? Well, yes, Your Honor, you should. Because under the third amendment is void, and that's an issue that's before you, because it only passed with requisite lender consent. If you look at Section 10.5B-9, it provides that any amendment cannot be effective without unanimous lender consent if such amendment, quote, or the effect thereof, close quote, would amend the definition of requisite lender for a lot of shares. Black Diamond Spectrum successfully argued before the New York State Court that to give meaning to the phrase, quote, the effect thereof, close quote, Section 10.5B must be construed to apply to indirect as well as literal amendments, and that any amendment to a material term integrated into the definition of those terms necessarily has an effect on how those terms are defined. The third amendment eliminates $135 million of term loan exposure and LC exposure, each immaterial term integrated into the definition of requisite lender from the denominator of the requisite lender fraction, which has the effect of amending the requisite lender definition. So how so? Well, let's say it's true that lender approval was required. Why does it necessarily follow that the third amendment was invalid in that none of the lenders have had standing at the time to be deemed lenders have come forward to challenge it? You know, the UKIPA is using it as a sword, as it were, but isn't that a condition that was really intended for the beneficiaries, the other lenders, and they haven't challenged it? You know, we didn't buy debt under the third amendment, so we are not using it as a sword. We are stuck with it because we made a judgment that the fourth amendment would be valid and the New York State court ruled otherwise. But the credit agreement is not set up so that individual small lenders have to come into court to affect their rights. The way that the debt holdings are set up is UKIPA is a major holder, Black Diamond and Spectrum are major holders, and other than the agent who we have settled with, you've got very small holders who ordinarily would not invest the time or money to come forward. Before the third amendment, the requisite lender definition required that a requisite lender hold more than 50% of the approximately $244 million in outstanding debt. After the third amendment, by deleting $135 million from the denominator, the district court found that a requisite lender must hold only 23% of $244 million. Yeah, but that's because you became one of the lenders by the assignment and you weren't an eligible assignee, so therefore there was a reduction of the eligible assignee share, which took the denominator down. Well, your honor, whether we were eligible as an LLC or not doesn't matter for purposes of whether we were a lender under, to be included in the government. Now before the third amendment you weren't a lender at all. Well, when the fourth amendment was passed, we became a lender, and under the credit agreement, as soon as CIT as agent put our debt on the registry, we were deemed a lender for all purposes under the credit agreement. That's at section 10.6b. But that was after the third amendment was adopted. Well, the third amendment was adopted, but UCIPA did not acquire debt under that third amendment. UCIPA only acquired debt under the fourth amendment, and at that time the agent put our debt on the registry. And the credit agreement actually says that once on the register, all parties quote, shall deem and treat quote, UCIPA as the holder and owners of such debt for all purposes hereof. That's at JA 2469 and 2470. So it's undisputed that CIT as the agent put our debt on the registry. It's undisputed after the fourth amendment. When the fourth amendment was voided, you still have the debt. Correct. And we're still on the registry. And you're still on the registry, but let's go back before those circumstances occurred to before the third amendment. Before the third amendment was adopted, you didn't have any debt. That's correct. And so therefore you were not a lender. That's correct. All right. So how could you be an affected lender if you weren't a lender at all? We're not saying that it's just for us, Your Honor. The credit agreement says any lender who would be affected by these changes to the definition. Judge Crass asked you, none of the other lenders came forward complaining about that. That's because they are small and they did not participate at all really in the allows this to occur. Because now we're under the credit agreement and we're stuck. And so the Black Diamond and Spectrum have argued consistently that we have to look solely within the four corners of the credit agreement. And the credit agreement says that if the third amendment was going to be valid, it needed to be approved by all lenders. It doesn't say... But if none of the affected lenders are complaining, what gives you standing to come in and argue a position for the affected lenders? Well, Your Honor, we're both... Because you weren't a lender before the third. Well, actually you weren't a lender before the fourth. Well, we were. It's sort of a convoluted set of facts because we actually were a lender at the time that the third amendment actually became binding and conclusive on our debt. Because when we bought under the fourth amendment, under 10.6 of the credit agreement, we became a lender for all purposes under the credit agreement. At the time that the fourth amendment was voided, the bankruptcy judge said that we were stuck with the terms of the third amendment. At that moment in time, there was no finding that we were not a lender. So, in fact, we backed into being a lender under the third amendment when the fourth amendment was vowed. That's not really the case, is it? Didn't the New York court say that there was no credible dispute? That the original agreement had absolutely prohibited your claim from becoming a lender? That was the state of affairs at the time of the enactment of the third amendment. Your Honor, we would not agree with that. With the New York court having found that, why shouldn't we follow that as its interpretation under state law of the agreements that we're looking at here? Because the New York state court was only looking at the effect of the fourth amendment. Under the third amendment and under the original credit agreement, we weren't entitled to become a lender if our debt was so, therefore, we weren't entitled to be a lender. But that is directly at odds with applicable New York state law. Generally speaking, under New York law, a prohibition in a contract against assignment is a personal covenant of the party to that contract. If the assignor, in this case Combess, had assigned debt to you in violation of that agreement, the damage claim was against the assignor for breach of that personal covenant. Now, there are two limited exceptions to that rule that we identified in our papers and in the cases that we cited below and in our papers. The first is laid out by the New York state court of appeal in Alhusen-Carristo Construction Company in 1952. If the contracted issue expressly states that any transfer is void, that new language creates more than just a covenant of the party not to assign. The second narrow exception is in the case where they held that a contract does not need the void language, that magic language, to block an assignment in the limited circumstances where the assignor expressly acknowledged in the agreement that he lacked the power to sell or transfer and that the assignor expressly, quote, expressly, clearly, and unequivocally surrendered not only the right but the power to assign his rights under the agreement. Here, it is true that Euclipo was identified in the eligible assignee, but the other provisions of the credit agreement provide that that was a more of a permissive restriction. It said, you other lenders, if you have the right to assign to an eligible assignee, nowhere does it say that an assignment to someone other than an eligible assignee is void. And, in fact, when CIT put us on the registry, section 10.6 is not subject to any definition of eligible assignee because it provides that as soon as Euclipo was put on the registry, it would be deemed and treated as a lender for all purposes. Why are, by negative implication, the powers of the assignor limited by the very terms you were just talking about? I'm putting this case on all fours with Singer and Seale. That is, if one can only make an assignment to those who meet the criteria for being the eligible assignee, doesn't that mean that the assignor necessarily lacks power to make an assignment to someone who doesn't meet those criteria? You know, I have to confess that, at first, the argument that was laid out in LHOOS and others seemed counterintuitive. But, in fact, there are a whole slew of cases that actually say that if you have a provision in a credit agreement that says, you can assign to the following people, there is no such negative implication. The contract has to go on to say, any transfer to someone other than this is, in fact, a void transfer. Or, as in the Singer and the other cases, the contract actually has to agree that it has no right whatsoever to pledge, hypothecate, or transfer its rights. And, here, it didn't say that. And, in fact, when CIT put our debt on the registry, that trumped all of the provisions of the credit agreement. And, when CIT, the registry is a cornerstone of finance. The registry that the agent puts debt on is the only place. And, it controls, for all purposes, who is a lender, who the debtor needs to communicate with, who gets distributions and notices, who gets to vote as a requisite lender or otherwise. So, with... Go ahead. You can continue. Thank you. I did want to go back to... Let me ask you this question before we hear from the other side. If you could be the requisite lender under the First Amendment, would you propose to Convest that they adopt the Fourth Amendment? The Third Amendment was out there. And, rather than get into a debate about whether or not we would have to convert all of our debt into equity pursuant to the Third Amendment or walk into a situation where there was an amendment already there that laid out how the term loan debt would be treated, we entered into the Fourth Amendment, which waived the provisions in the Third Amendment. We negotiated and were so onerous to us that we decided not to buy debt as a result of the Third Amendment. We waited. The Third Amendment came about because the company and certain lenders in Yucaipa were actually interested in Yucaipa buying debt to help the company out. But, at the end of the day, Yucaipa didn't have the final say on the Third Amendment and the terms were not satisfactory to Yucaipa. So, Yucaipa decided to wait. Convest then bought up a whole lot of debt and then Yucaipa and Convest negotiated a Fourth Amendment, which was separate and apart from the Third Amendment. I do want to come back to a couple of points. We'll have you back on rebuttal on those couple of points. If I could just have another minute on… One second. One minute. So, the other reason why the Third Amendment is void, besides having the effect of changing the definition of term loan share by materially decreasing the amount of term loan debt that was in that calculation… Mr. Clement, can I ask you, and maybe you can come back to this on rebuttal if you need to take a look or consider it. But, let's say the Third Amendment is void to the extent that it changed those definitions and we accept that argument. There's another provision in the Third Amendment, 2.7b, that seems to deal specifically with what happens in the case of insolvency, and this is at JA 1872. And it requires in the case of insolvency that the voting rights that are associated with Yucaipa's term loans be automatically and irrevocably assigned to the other lenders who hold term loans on a pro rata basis. Even if we agreed with you that the provisions that changed the definition were invalid, why wouldn't this one, dealing in particular with the circumstances where there's insolvency, be severable and still be enforceable? If you wouldn't mind if I just had a minute to take a look at that, and I can come back to you on that. Absolutely. But just to wrap up the additional point, is Section 10.b.9 also states that any amendment that has the effect of amending the definition of pro rata share must pass with unanimous consent. Pro rata share is a fraction. It's actually three fractions. At the bottom of each, the denominator for each has revolving debt, LC exposure, and term loan exposure. So unlike requisite lender fraction where all the debt is together, here there are separate fractions for each one. And to the extent there's an effect of amending that definition, you need unanimous lender consent. The requirement for unanimous lender consent here is important because lenders are affected if their individual pro rata share increases, including, for example, increasing their share of any indemnification obligations with respect to losses, expenses, and damages that might be suffered by the agent in the exercise of its rights and powers under the credit agreement. That's at Section 9.6 JA2459. The third amendment, interpreted by Black, Diamond, and Spectrum, eliminating 50% of the UCIPAS term loan debt through conversion to equity has the effect of changing the definition of pro rata share by materially decreasing the amount of term loan debt in the pro rata share denominator, which in turn increases the other lender's obligations under the pro rata share. Importantly, Section 10.5B9... Mr. Klineman, I think you had all that in your brief. There's one... Actually, don't hear it back on rebuttal. We've got other cases that we'll call you back on rebuttal. Mr. Ward. Thank you. Good afternoon. Robert Ward from Schulte, Roth, and Zabel on behalf of Black, Diamond, and Spectrum. And if I could also address the mootness point initially. We believe this case is moot. The reason is that the requisite lender has nothing to do. The assets have been sold. The plan has been confirmed. And those are the two primary functions, in fact, the only functions at this point of the requisite lender. And the reason we say that is that this appeal is only in one case. And there were a number of adversary proceedings before the bankruptcy court. But the appeal has only been taken by UKIPA in what we call the Allied case, which was a case brought by the debtor. And the only relief sought by the debtor in that case was to name the requisite lender. In addition, I looked at this earlier today and last night, to the extent that a court found that the Fourth Amendment was not valid, a judicial declaration necessary to guide the debtor's actions in formulating and carrying out a course of action in the bankruptcy case to maximize the value of the debtor's estate, meaning the sale of the assets in the plan. That's already taken place. What about collateral consequences? Your colleague on the other side of the aisle was pointing out that this could affect the party's rights in other litigation. Wouldn't that be enough to keep alive the issue? Actually not, because that's an incredibly good point. In fact, I think one of the cases that Your Honor sat on in 2015 called Robinson v. PNC, if I can find the right site. Let me first talk about that other case. There is a second case, which we call the committee case, which was brought after the Allied case, which is the only thing that's up on appeal before the Court here today. In the committee case, there are claims against you, Kaiba, for equitable estoppel, breach of contract, and other issues. When Judge Sanchi ruled and granted summary judgment, he granted, appointing the requisite lenders, he rendered that decision in both actions, in both the Allied action and in the committee action. However, the appeal before the Court today is only in the Allied case. And as this Court held in the Robinson case, I'll find it in a second, where a party appealed from an order entered in one action, the Court of Appeals did not have jurisdiction to review district court orders entered in a related action. And what the Court found in that case is that if there's an appeal in one case, one docket number, one caption, but not in a related action, that related action is not up on appeal, this Court doesn't have jurisdiction. So the point is, what Mr. Kleinman was saying, is that not the issue of the requisite lender, because that's done, that's over and done. The requisite lender has done everything that they can and need to do. There's nothing left for them to do. However, the issue of the Third Amendment is still relevant in the committee action. However, the committee action is not before this Court. This Court doesn't have jurisdiction with respect to that. And with respect to the committee action, the Court's decision there is only a granting of partial summary judgment, because in that committee action, as we say, there are actions for equitable subordination against your KIPA, brought by the committee, my clients are interveners in that case, future contract, et cetera. However, that case is not over. There's still document discovery to be done. There's depositions haven't even started. You're saying that the committee action, and this is the allied action, we have the allied action in front of us, and you're saying that the committee action is the one in which potential claims may still lie. Are you saying that we have to look at the separate adversary actions within a particular bankruptcy? Do you want to unmute this question? Yes, Your Honor, because I believe. But what case is out there that says that? Well, we're citing the Robinson case, Your Honor, Robinson v. PNC, which is 631, I don't know if it's 102, it's a case from 2015 that Judge Crouse was on. 631 what? It says fed APPX, I assume. Oh, yeah, APPX, though. Exactly. He's telling me that. You understand that's an NPO, and certainly whatever that is, it's not binding on us. I understand, Your Honor, and in fact it was a procuring opinion. However, the point that I'm trying to make, Your Honor, is. . . The point I was asking, is there a case, is there a precedential opinion, that would say that the mootness doctrine has to be considered on a separate basis for different adversary actions? We didn't find any, Your Honor, except for the general proposition that if something does not appeal to this court, it's not before this court, this court has no jurisdiction. But I'd like to make another point at the same time. In the committee action, the decision by Judge Sanchi is an interlocutory decision. It's only a partial summary judgment as to the effectiveness. . . I understand that. So it would be piecemeal litigation, and what's going on, Your Honor, in the committee action, is the committee action is continuing. There are going to be depositions. But isn't there some benefit to these ongoing cases on the question of whether or not the Third Amendment is valid? Well, Your Honor, that question could be asked in every case that comes up to the court that's not a final judgment, and I believe basically if something is interlocutory, the court is very sparing in terms of granting an appeal. We may not have jurisdiction over the committee case or orders there, but what prevents us from taking account of whether rulings we may make here still have an effect on even other pending litigation? Isn't that an exception to mootness? Because what we're really looking for is whether the parties before us still have a stake, a live interest in effectively litigating the issue before us, and why don't we have that even if the consequences are in other actions? Well, there's a couple of answers to that, Your Honor. Recall that it's Allied that brought this action. Allied is not even the appellant here. So Allied apparently has determined that this action is moot. That's the Allied action. With respect to the committee action, as I say, Your Honor, the general rule against piecemeal appeals would seem to apply there. There's an awful lot of work still to be done in those cases in terms of discovery and in terms of motions. The case has to be tried. The case may be settled. It may not be back to this court again. And, in fact, when the appeal was taken to the district court, there was an appeal in both the committee action as well as in the Allied action. For some reason, when E. Kuyper brought this action to this court, it only appealed in the Allied case. Let me ask you one final question on this mootness issue. Sure, Your Honor. You did not raise this in your brief. We did not, Your Honor, but as Judge Krauss said, I think it's always an issue. I think it's subject matter jurisdiction. I understand. I just wanted to make sure that you're 100 percent right, Your Honor. We did raise the issue in argument before the district court. We didn't raise it formally in our papers here, Your Honor. I understand. Why don't you proceed to the merits here of this question before us? With respect to the Third Amendment, I think a very telling point is what Judge Krauss pointed out, that nobody has ever objected. And the other telling point is that E. Kuyper was not a party to the agreement at the time. It was not a lender. It had no right to object to the Third Amendment. We have your own statement in the state court arguing as to the Fourth Amendment that any amendment to a material term integrated into the definition of requisite lender necessarily has an effect on how requisite lenders are defined. That position that you took there was successful in invalidating the Fourth Amendment. It was. Why aren't you stopped from taking a different position on exactly this issue in this litigation? Well, because there's two issues. One is the effect and the other is the affected lender, and maybe that gets a little confusing. Whether or not it has an effect in terms of the definition doesn't necessarily mean that it affects the lenders. The fact is, as we argued in the Fourth Amendment, and to be clear, here's what we said in the Fourth Amendment, that there is an effect. But the fact is before the Fourth Amendment, E. Kuyper could not become the requisite lender. After the Fourth Amendment, it could. So the lenders there were clearly affected. And the major difference in the two cases was that. But the other point was we were arguing that E. Kuyper can't hide from the fact that there was a change between the Third Amendment and the Fourth Amendment by saying that they didn't change the actual definition of requisite lender. If an effect of changing one of the terms that goes to make up requisite lender changes who becomes the requisite lender, then it should have some effect. However, that doesn't mean that there were affected lenders. There were no affected lenders in the Third Amendment. And as Your Honor pointed out, and this is actually my first point to make, which is it's been almost nine years now and not a single one of the lenders has raised its hand. Not a single one of the lenders who was a lender at the time of the Third Amendment, which was not E. Kuyper, has raised a hand to say that they were affected. Now, what Mr. Klein says is – Have you argued either waiver or ratification in your – I mean, what you're basically saying is the lenders, the potentially affected lenders, haven't raised an objection, so it's either waived or implicitly ratified. Have you specifically argued that? We didn't specifically argue that, Your Honor. We simply said that there were no other lenders. There were no lenders that were affected because E. Kuyper wasn't a lender. And Mr. Klein makes the point that the lenders were all too small. Well, that didn't stop them in the Fourth Amendment. And it was the same pile of pool right over the lenders in the Fourth Amendment as it was in the Third Amendment. They certainly raised their hands in the Fourth Amendment and said, we're affected by this and we oppose it. They didn't do that in the Third Amendment. I think that's quite telling. One thing to remember is that it was E. Kuyper that orchestrated the passage of the Third Amendment and the Fourth Amendment both. And what happened is after the Third Amendment was passed, for some reason they didn't like it. But remember, they thought they had to pass the Fourth Amendment. If they thought they had to pass the Fourth Amendment, they clearly believed the Third Amendment had an effect. So coming here today and saying it was waived, first off, I don't even know that they have standing because they weren't a lender at the time. However, they negotiated the passage of the Third Amendment. How do we know that? The fact is, in the record, there's an e-mail from the chairman of the board of Allied who was appointed by E. Kuyper, and it's an e-mail to E. Kuyper's principal, Ron Burkle, and it says, and this is at J2620, we, that's E. Kuyper, also successfully obtained an amendment from our first-name lenders, allowing us, which is E. Kuyper, to buy first-name debt and convert both the first- and second-name debt into equity. Allied wasn't allowed to buy debt. Up until the Third Amendment, and even after the Third Amendment, it specifically says that debtor can't buy debt. The fact is, the chairman of Allied who was appointed by E. Kuyper is writing to the chairman of E. Kuyper saying, we successfully passed this amendment that allows us, E. Kuyper, to buy debt. The fact is, they orchestrated the passage of the Third Amendment. For some reason, though, it didn't work for them. They weren't a lender at the time, they didn't have standing to object, but I think what also should be held against them is the fact that they passed this Third Amendment, and now because it didn't work out for them, they're coming back to us and saying, well, it was void. They didn't think it was void at the time. They passed it. In addition to that, they passed the Fourth Amendment to get around the Third Amendment. If the Third Amendment was void and didn't have any effect, then why are they so intercised about that? Aren't we dealing with the question of contract formation? We're looking at the validity at the inception of the Third Amendment. Why should it matter whether or not the effective lenders at the time gave their approval when the terms of the original agreement require to be validly enacted, to even be formed, that the Third Amendment have that approval? Well, that's interesting. I was looking at the agreement again, the underlying agreement, 10.5. The language respecting amendments doesn't say that one looks at the language of the amendment to see if the lenders are affected. It says, are there any lenders who are affected thereby? Each lender that's affected thereby. By the way, Mr. Kleinman said there had to be unanimous lender support. That's not true. It says each lender affected thereby. It's possible some lenders were affected and some lenders were not. There's more of a subjective component to this than if the language had said somebody, a court, for example, looks at this to see if the language affects any of the lenders. It seems to have a subjective element which allows someone to come and raise their hand and say, I'm affected thereby. And no one said they were affected thereby. So I think it's a slightly different situation than if it had been written differently. But I still think it's very telling that after nine years nobody came forth to say that this was a problem, except for UKIPA, which passed it in the first instance. Can we tell from the face of the Third Amendment that lenders are affected thereby? And even that insolvency provision, the 2.7 provision I was asking your colleague about earlier, affects the voting rights of other lenders in the event of an insolvency and provides what will happen to UKIPA's voting rights pro rata. It does. And the only point I'm trying to make is that the lenders, very sophisticated lenders, didn't feel that they were affected. They did feel that by the Third Amendment. They did feel they were affected by the Fourth Amendment. And I'd like to just, if I could because I'm running out of time, just move to one other argument, which is it seems that the primary grievance that UKIPA has is that a couple of minority lenders became the majority lender and, in effect, became the representative lender. But the reason for that, and I think Judge Cross, Judge Fischer, or Judge Millay, certainly one of the three of you made this point, which is it was UKIPA's own acts that caused that. The fact is if UKIPA hadn't bought 55 percent of the debt, which was then disallowed for voting purposes by virtue of the Third Amendment, my clients couldn't have gotten anywhere near 50 percent. By virtue of them buying that 55 percent, my clients were holding something like 48 percent. And then they bought another $4.5 million in debt from AMMC, and that got them over the hurdle of 51 percent. But if I can very quickly go over the numbers, if UKIPA stayed within the lines and had bought what they were entitled to buy, which was the lesser of $50 million or 25 percent of the term loan debt, and that number is $43 million, and if you subtracted that number from the amount of outstanding debt instead of the whole 55 percent, my clients go from 23 percent to about 28 percent. It's not a material change. So the fact that they went to 48 percent and got very close to being a requisite lender is purely as a result of UKIPA overbuying the debt and violating the agreement. If they had stayed within the lines, we would have been about 28 percent. Now, the definition of requisite lender is one or more lenders that amount to a majority. It doesn't have to be one majority lender. And I would also point out that UKIPA, if it had stayed within the lines, would only have owned about 18 percent of the debt. And so what probably would have happened, and one reason that clearly there was not much of an effect or affect here, was that if UKIPA had done what it was supposed to do, it would have owned about 16 to 18 percent of the term loan debt, of the total debt. It would have been about 25 percent of the total term loan debt, but there's also LC debt, the letter credit debt, and revolving debt. It would have owned about 16 percent. We would have owned about 28 percent. Well, the lenders could have gotten to get home. I'm sorry, Your Honor. Well, on the affect issue, it seems to me that what UKIPA is saying is that the lenders were not affected in the sense that UKIPA could not become a requisite lender under the Third Amendment, but maybe there are some lenders who don't want your client to be a requisite lender either. And so they're affected in that sense. All they had to do was raise their hand. Nobody did. Everybody went along with this. But the argument is that they didn't have to raise their hand. They had to sign the amendment. They had to sign the Third Amendment? Right. I guess what I'm not fond about that, Your Honor, is a more simple proposition, which is the way a requisite lender works is if you don't have a majority lender and if UKIPA bought some of the debt, some of ComBest's debt, there would have been no majority lender. My clients could have gotten together with other clients and become the requisite lender. That's, in effect, what they did. It was a little easier for them to do so because UKIPA overbought the debt. But even if UKIPA had stayed within the lines and bought their 16% or 18% of the debt, my clients were still at 28% of the debt able to align themselves with other lenders and become the requisite lenders. I don't think there would have been much of an effect, and that's why we think that no lender raised their hand and said we were affected. Because, remember, before the Third Amendment, UKIPA couldn't become the requisite lender. After the Third Amendment, it couldn't become the requisite lender. In addition, the language in 10.5 says there has to be a change to the definition. It doesn't say there has to be a change to the calculation. Now, that may be slicing it a little too thinly. However, the only change was the numbers that were put in. And the reason that I was going through the rudimentary math exercise is to show that there really wasn't much of a change that happened by virtue of the Third Amendment. And, again, testimony to that is the fact that nobody objected to that. The other point I'd like to make very quickly is under the First Amendment, UKIPA is even in a worse position. They can't buy any of the debt whatsoever, so we're not sure why on earth it is that UKIPA wants to go back to the First Amendment. What they say is that they can buy the debt, but it's very clear in the First Amendment that they can't become an eligible S&E. And one of the points that I wanted to point out is that in order to buy the debt, you have to assert in the assignment form that you're an eligible S&E. If there's no Fourth Amendment and if there's no Third Amendment, and if we're back to the credit agreement, which is where we ultimately would end up if there's no Third Amendment, they would have to assert that they're an eligible S&E. They can't do that because they're specifically defined out as being an eligible S&E in the First Amendment. But if the assignment is valid, if we're back to the original agreement, the original agreement doesn't interlink the definitions of lender and eligible S&E, whereas the Third does. I think it actually does link it more than UKIPA lets on. The fact is there's only two ways to be a lender. You have to be an original signatory, an original lender, and they weren't. Or you have to be an eligible S&E, and they weren't. I think the argument that we can become a lender by violating the agreement doesn't really get them very far. The fact is that, as the Pravin case and as the other cases from the 7th District, which are not binding on this Court, so if there's just a general provision that says who can be the eligible S&E, that's one thing. But in our case, there's actually a provision that said who can't be the eligible S&E. And it said the sponsor, which is UKIPA, couldn't be the eligible S&E. The point that UKIPA makes that they could have bought the debt and simply sat on it just doesn't seem to make a whole lot of sense. If they were a stranger to this agreement and had nothing to do with it, then maybe it has more of those in it. But the fact is they were intimately involved. They were running Allied at the time. They were the majority owner of the equity. They appointed all the board members. And the fact is the credit agreement, which they had a hand in drafting, specifically excluded them from becoming a lender at all. But no one's disputing that they're excluded even by name. But the specificity of the exclusion and the definition of eligible S&E, what relationship does that have to whether under governing state law the assignment ends up being void or voidable? Well, Your Honor, it doesn't seem fair to us that we would have had to have sued Condest in order to reverse the transaction or fair to us that we would have had to sue UKIPA. But if we're in the land of fairness, isn't that where your equitable remedies come in? True, Your Honor. And then what I'll do is back up to our legal remedies, which is that the agreement says they're not the eligible S&E. So to the extent what they do is they find a lender who will sell them this debt, again, it doesn't resonate well because they were actively involved in the drafting of the credit agreement. They knew what this provision said. They were not a stranger to the agreement. But just as importantly, the best that they would do in those circumstances, I believe, Your Honor, is have bare legal title to the debt, to the amount of the debt. They wouldn't have the contractual right to vote. They didn't comply with the terms of the contract. So as a result, how do they get what goes along with the contract, which is the right to vote and to participate? They can hold on to the debt, but they can't vote it. And, in fact, one argument that they make, and I give this one to Tom. Mr. Ward, I think we understand your position. Thank you, Your Honor. Mr. Kleiman, for one minute of rebuttal, that's all you say. Yes, Your Honor. That was your risk. I had to twist your arm to take that, too. So we're going to limit you. Ready to go. All right. Can you address the last point that was raised by Mr. Ward? So you meet the definition by percentage of being the requisite lender. But under the original agreement, you can't vote. How could that be? Your Honor, we are not here today seeking to be requisite lender. We're only seeking relief that they can't be requisite lender. And, in fact, under the terms of the denominator in the requisite lender fraction, term loan exposure, revolving exposure, L.C. exposure, there's no requirement that the holders of that debt have any voting rights whatsoever. It just refers to the holders of that debt. And what the district court did and what Black Diamond urges you to do is to read into those defined terms that for purposes of the requisite lender definition, they must be voting debt. And that's just not in the four corners of the clarity. So all you're here today to do is ask us to declare the Third Amendment invalid. Third Amendment invalid, that Black Diamond and Spectrum are not requisite lender. That's it. That's it. And that we validly hold the debt under the case law that we identified. Okay. That makes it simple. And your red light's on. Your Honor, there was just one point that I wanted to clarify when I got cut off before. If that's okay. Your red light was on and I cut you off, but go ahead and put this properly. The Third Amendment had the effect of changing these definitions. And, importantly, if we go back to Section 10.5B9, it contains an important proviso which highlights that unanimous lender consent is needed for any amendments that has the effect of reducing the debt that's included in pro rata share requisite lender definition. The proviso provides that despite that it's in this 11 factors that require unanimous lender consent, it provides that only requisite lender consent is needed if the amendments increase the amount of outstanding debt that can be included in the requisite lender or pro rata share calculation. So what that means is if you're going to decrease the terms that fit within those denominators, you absolutely need unanimous lender consent. And this harmonizes with Section 10.5B7, which requires unanimous lender consent of any lender that would be affected by any amendment that has the effect of reducing the principal amount of any term loan. I'd also add on that little guy not standing up and raising their hand point. When they challenged the Fourth Amendment, the only plaintiffs were Black, Diamond, and Spectrum. It wasn't, as Mr. Ward said, lots of other smaller lenders came to the fore. Can you address very briefly why isn't 2.7 severable? Doesn't it tell us exactly what the parties wanted to do in this situation? Well, Your Honor, it says what parties that were not UKIPA wanted to do in that situation. And it also, to the extent that we can hold the debt and it becomes part of the requisite lender and pro rata share calculation, we don't necessarily need to vote it. Our whole point is that having it as part of that calculation doesn't require any voting. You can be part of that denominator for requisite lender and never cast a vote, never give consent, and just hold the debt and just be protected by the fact that any decisions or amendments will be protected by majority rule as opposed to 23 percent rule. Is it your position UKIPA didn't consent to the Third Amendment? Yes, Your Honor. UKIPA never bought debt pursuant to the Third Amendment. UKIPA is not a signatory to the Third Amendment. UKIPA only bought first lien debt under the Fourth Amendment. It didn't actually go forward and buy it, but the terms that were there in preparation for buying, you're saying UKIPA didn't consent to the terms? UKIPA negotiated those terms in part because it permitted UKIPA to buy, do certain things with second lien debt. But they never agreed to the owner's terms of the Third Amendment. If they had, they would have bought the debt then. Yeah, but that's an ingenious argument. You negotiated those terms as a majority shareholder. We negotiated those terms as a potential buyer of debt. Yeah, but you were the majority shareholder of Allied at the time. We were, Your Honor, but we were the natural... Well, how can you say you didn't negotiate the terms? Because the terms were ultimately negotiated and agreed to by Allied, which had a separate board and had separate... But you appointed. But, Your Honor, shareholders appoint boards all the time, and that doesn't mean that they become the board members. They have separate counsel. There was a committee that was set up to evaluate the purchase of debt. UKIPA was a shareholder and was known to these lenders as a possible buyer of debt. When the Third Amendment was being negotiated, it was at a time when there was great financial stress in the marketplace, and lenders wanted to sell their debt. So it was only natural that they would come to UKIPA, who, in the first bankruptcy to save Allied, had actually bought debt to try and negotiate the terms. But UKIPA never was bound by that Third Amendment, never bought debt pursuant to that amendment, and if that was the only choice, they never would have. Okay, we understand your position. Thank you. Thank you, Mr. Connolly. And we thank both parties for a job well done in a complicated case, and we'll take the matter under scrutiny.